(C. D. 1333)

EASTMAN KODAK COMPANY *v*. UNITED STATES

United States Customs Court, First Division

(Decided June 12, 1951)

*Strauss & Hedges* and *Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel); and *Lawrence, Tuttle & Harper* (*George R. Tuttle* of counsel), associate counsel, for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Daniel I. Auster, Joseph E. Weil*, and *Sybil Phillips*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 26 Cust. Ct. 251, C. D. 1332, decided concurrently herewith, controls disposition of the present case. The issues in both are identical and much of the voluminous proof offered by the respective parties appears in each case, making both records substantially the same. Plaintiff's counsel, in their brief, explain the condition in this way:

This case was tried concurrently with the *Geo. S. Bush & Co. Inc., et al.* v. *United States*, Protest No. 120086–K, which involved shark liver oil imported from Canada. Except for that testimony involving the respective methods of production of the shark liver oil, and that testimony touching on the restrictions imposed by the Canadian Government upon the exportation of shark livers, the evidence in all other respects is identical. Messrs. Lawrence, Tuttle & Harper, counsel for the plaintiff in the Geo. S. Bush case have written an able and comprehensive brief in that case, in which the issues of law and fact are thoroughly presented, and to which we respectfully refer the court in considering the case at bar.

Because the two cases are so closely associated, the decision herein will follow the same reasoning and embody some of the language employed in the *Bush* case, *supra*.

In this case, the merchandise consists of shark-liver oil from Mexico; in the *Bush* case, the substance was dogfish-liver oil from Canada. Here, as there, the commodity was classified as an advanced drug under paragraph 34 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 34),[1] assessing duty at 10 per centum ad valorem, and plaintiff claims free entry under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1669)[2] as a crude drug.

During the course of the trial, defendant injected an alternative claim, urging classification under the provision for "Shark oil and shark-liver oil, including oil produced from sharks known as dogfish, not specially provided for," in paragraph 52 of the Tariff Act of 1930, as amended by the trade agreement with Canada, 74 Treas. Dec. 235,

---

[1] PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

[2] PAR. 1669. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

T. D. 49752, carrying a rate of 10 per centum ad valorem, the same as that applied by the collector.

In presenting such claim, however, defendant has not abandoned the collector's classification as an advanced drug, so we find defendant in the dual position of seeking a new classification and at the same time attempting to support the collector's action. The condition is the same as that developed in the *Bush* case, *supra*. In fact, defendant's brief, arguing the point in identical language as that used in the *Bush* case, erroneously refers to the merchandise in question as "dogfish-liver oil imported from Canada." That the present merchandise is shark-liver oil from Mexico, is no bar for invoking a provision of the Canadian Trade Agreement, *supra*, because under the most-favored-nation clause of section 350 (a) of the Tariff Act of 1930, as amended [3] (19 U. S. C. § 1351 (a))—the statute that authorized the President to negotiate foreign trade agreements—the concessions granted under said trade agreement are also applicable to products from Mexico.

Both parties, arguing for or against the applicability of paragraph 52, as amended, *supra*, raise the same contentions in this case as those presented in the *Bush* case, *supra*. Because our conclusion there is equally applicable here, especially in view of plaintiff's uncontradicted testimony that shark-liver oil, the medicinal substance, was not developed as a commercial commodity until 1944, several years after the Tariff Act of 1930 became effective, no useful purpose would be served by repeating here all that we said there. Following such previous reasoning in the *Bush* case, we hold that said paragraph 52, as amended, has no application to the shark-liver oil under consideration in this case.

---

[3] Sec. 350. (a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

(1) To enter into foreign-trade agreements with foreign governments or instrumentalities thereof; and

(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign-trade agreements, as are required or appropriate to carry out any foreign-trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided*, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because o other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

Elimination of amended paragraph 52, *supra*, reduces the issue to the single question concerning the condition of the shark-liver oil here involved. That the substance is a drug, within the meaning of the term as set forth in paragraph 34, is implied in the collector's classification, which rests upon the presumption that all facts essential to sustain such action were found to exist. *W. T. Grant Co.* v. *United States*, 23 Cust. Ct. 58, C. D. 1191, affirmed in *Same* v. *Same*, 38 C. C. P. A. 57, C. A. D. 440, decided October 31, 1950. Thus, the issue is narrowed to the question whether this shark-liver oil is in a crude state, as claimed, or advanced in value or condition, as assessed.

The case has been the subject of several hearings as enumerated in the writer's dissenting opinion in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175. Final submission was made at Seattle, Wash., before a single member of this court on circuit under statutory authorization issued by the chief judge to hear or to hear and determine the case (28 U. S. C., 1946 ed., Supp. III, § 254). The right of the division to assume jurisdiction was largely the subject of said C. D. 1175. The views of the writer of this opinion continue as the minority expression from this division on the matter. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering to my position in C. D. 1175, *supra*, but for the purpose of expediting the work of the court, I am preparing this opinion and participating in the judgment attached thereto.

Shark livers, like dogfish livers, are desirable for their quantity of the therapeutically valuable vitamin A. To obtain the maximum amount of vitamin-A content, the livers are destroyed and the therapeutic element is extracted in oil.

The source of the shark livers and processing thereof to acquire the oil under consideration were explained by two of plaintiff's witnesses, the general manager, and the chief chemist of the Mexican exporting company. Their combined testimony establishes the following pertinent facts.

Livers are taken from sharks caught in waters of the Gulf of California, off the east and west coasts of Mexico. They are chopped into pieces and put into 5-gallon cans, that remain unsealed and to which is added a quantity of salt (approximately 1 per centum of the weight). Fishing boats, equipped to preserve the livers, under refrigeration, transport them to the processing plant, where they are sorted according to species, of which there are three, hammerhead, bolador, and barroso. Each is easily distinguishable through texture and color. Following segregation, all of them are subjected to the same process for extraction of the oil. The livers are ground to destruction in a so-called "Enterprise" mill, reducing them to a fine paste that is pumped

to cooking tanks where water and sodium hydroxide (lye) are added. Lye is used to "break down the proteins" and obtain a better yield of oil. After heating to 180 degrees Fahrenheit, the mixture is run through a series of centrifuges, separating the oil from the liver tissue and water. The oil thus obtained, and without adding any other substance, is shipped in 55-gallon drums that are filled "within a half inch of the top."

The Mexican exporter's processing plant, the place of shipment of the oil in question, was built in 1944 "to conserve the vitamin content of the oil in the livers." The general manager of the company explained the reason this way: "Prior to the construction of this plant we were forced to hold the livers sometimes for several months to complete a carload shipment and we found that this delay deteriorated the vitamin content considerably. The shipment of oil instead of livers saved fifty percent of shipping space and consequently a saving of freight rates and other expenses. In shipping oil instead of livers we are now able to determine the exact value of the oil we are selling and shipping, which cannot be exactly arrived at by keeping the oil in the form of livers."

Distillation Products Co. of Rochester, N. Y., manufacturer of vitamin-A concentrates, ultimately received the oil in question and processed it, as explained by a chemist (manager of the products control department and assistant director of research) in this way:

At first we usually give a preliminary refining process, which involves filtration and neutralization of the excess free fatty acid with alkali, and removal of water and liver tissue, or materials floating around in the liver oil. At that stage we distill it by the process known as molecular distillation. In this process oils are passed into a vacuum chamber under a very high vacuum. The oil flows down in a thin film over a hot surface, and very close to that hot surface is a cold surface. The volatile materials in the oil pass over to the cold surface and are withdrawn. Depending on the materials used on the hot surface, we can distill various fractions of the oil, and for our purposes we usually take a small fraction first that contains the odoriferous materials in any remaining free fatty acids, and the next fraction contains the Vitamin A, and sometimes, if they are present, the antioxidants of the oil.

Treatment of the oil, as above described, produces a "concentrate of Vitamin A which may be from five to twenty times the potency of the original oil."

Several phases of this case, including the question of whether shark livers are drugs in the tariff sense, the matter of chief use of the imported shark-liver oil, commercial methods employed as preservatives of vitamin content of livers during transportation, the cause and effect of processing the livers in the country of exportation, and whether such treatment is essential to proper packing and the prevention of decay or deterioration pending manufacture, are governed by the *Bush* case, *supra*, through incorporation herein of testimony offered by both parties in that case on the various subjects referred to.

Rather than unduly lengthen this decision with a repetition of the discussions given in the *Bush* case, all of which have equal force and effect herein, suffice it to say that, for the reasons set forth therein, we find that shark livers from which the imported oil was obtained are drugs in the tariff sense, that they are articles of commerce, that processing thereof in the country of exportation into the form of oil advanced the crude drugs along the line of their ultimate manufacture, and that such treatment in Mexico of the shark livers was not essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, but on the contrary, the manipulation in the foreign country advanced the crude drugs "in value or condition," bringing the imported oil within the purview of paragraph 34, *supra*, and classifiable thereunder as an advanced drug, subject to duty at the rate of 10 per centum ad valorem, as assessed by the collector.

The protest is overruled and judgment will be rendered accordingly.