(C. D. 1664)

### U. S. Vitamin Corporation v. United States

United States Customs Court, First Division

(Decided December 16, 1954)

*Eugene R. Pickrell* (*Michael Stramiello, Jr.*, of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Joseph E. Weil* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: Plaintiff, a manufacturer of pharmaceuticals, imported from Argentina certain vitamin-containing beef liver extract in dried powdered form. The product was classified by the collector under paragraph 34 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as a natural and uncompounded drug, advanced in value or condition, dutiable at the rate of 5 per centum ad valorem. Plaintiff claims the merchandise should be held free of duty under paragraph 1669 of the tariff act as a crude drug.

At the trial, the record in *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. (Customs) 73, C. A. D. 318, involving beef liver extract in paste form, was incorporated into this record.

The sole issue here presented is whether the merchandise under consideration was, at the time of importation, advanced in condition or value beyond that which was essential to prevent deterioration or decay in transit (R. 3).

No sample of the merchandise involved is before us, but there was received in evidence a bottle containing a sample of beef liver extract in powdered form from another shipment from a different manufacturer, who, as indicated by the record, employed the same manufacturing process as used in the production of the imported merchandise (plaintiff's exhibit 3, R. 31).

The deposition of Dr. F. F. Nicola Orsini, a resident of Buenos Aires, Argentina, a pharmacist and doctor in chemistry, who was the technical director of the company that produced the involved commodity, and who was familiar with the method employed in its production, was introduced in evidence by the plaintiff. The process used in making the imported merchandise was described by Dr. Orsini as follows:

Livers from young and healthy bovines are ground and mixed with water. The mixture is then adjusted to the isolectric point (pH 4.5–5) and heated to about 85° C, to coagulate protein. The liquids of the extractions are cooled down to separate the fat and filtered. The filtrate is reduced in vacuum to pasty consistency. The resulting concentrate is spread on pans and dried in vacuo and after being removed from the drier it is ground to the proper fineness. It may also be dried directly with a Spray-Drier. [Answer to direct interrogatory No. 12, plaintiff's collective exhibit 1, R. 52.]

The same witness further testified that, in the production of the beef liver extract in powdered form ("Con-Centrade de Higado Seco. Pulvo"), the reduction of the product to a solid consistency through evaporation of its liquids "has for its purpose the elimination of the greatest quantity of water of the extractive media in order to reduce the product to a consistency of extract or paste and avoid the ultimate development of germs and alteration of the product" (direct interrogatory No. 16); that the percentage of total solids in the dry powdered extract was 90.79 per centum; and that there was no foreign matter in the merchandise, but "it contains only the products coming from the liquid extracted from fresh and healthy livers" (direct interrogatory Nos. 19 and 20). His testimony continued as follows:

[Direct interrogatory No. 23]. Do you know whether the presence of water in merchandise such as or similar to the merchandise described in Direct Interrogatory No. 8 will cause it to decompose when in transit?

[A]. The quantity of water present is reduced and cannot cause any alteration of the product during transit.

[Direct interrogatory No. 25]. If the answer to Direct Interrogatory No. 23 is in the affirmative, do you know what is the minimum percentage of water which will cause decomposition in transit?

\*       \*       \*       \*       \*       \*       \*

[A]. 30 to 35 percent of water. [Direct interrogatory No. 27.]

[Direct interrogatory No. 28]. Do you know what percentage of water, if any, is in the merchandise described in Direct Interrogatory No. 8?

\*       '   \*       \*       \*       \*       \*       \*

[A]. 9.21 percent. [Direct interrogatory No. 30.]

With respect to the present issue, the witness stated that the imported product "was fabricated into powder state to prevent or avoid the possibility of fermentation or of decomposition" (redirect interrogatory No. 1) and that "if it had not been pulverized, it would have absorbed a greater quantity of humidity in handling, while in a powder state it is more stable to the variations in climate to which it may be submitted after embarkation."

Ephraim Gunsberg, a chemist employed by the importer, under whose supervision the imported merchandise was analyzed, testified that through his employment he had become familiar with the nature and properties of liver paste, having worked with such products for approximately 10 years. The witness further testified that, based

upon his experience, beef liver extract in paste form "cannot be shipped without refrigeration without the problems of deterioration" (R. 72). This witness, however, had no personal familiarity with nor had he seen the process employed in the manufacture of the imported merchandise in the country of exportation.

Mr. Gunsberg also testified that sample importations of beef liver extract in paste form received by his company had deteriorated and were unusable (R. 78). While Mr. Gunsberg did testify that, between 1949 and 1950, the plaintiff made two sample importations of beef liver extract in paste form, consisting of two cans in each importation, containing approximately 2 or 3 pounds to a can, yet no importation was made in commercial quantity. According to this witness, the cans were badly distended and swollen upon arrival. The effectiveness of this testimony, however, was weakened by the subsequent admission of the witness that, while the first importation had been thrown away, his company accepted the second importation and did not return either the first or second importation, and made no claims against the exporter (R. 79). The witness also admitted that the condition of the imported cans of beef liver paste could have been caused in the first instance by improper or careless packing of the merchandise (R. 80). He also admitted that he was not personally present to observe the type of livers used in making the liver paste contained in those sample cans and that he did not see the process employed in making the liver paste in such shipments. Furthermore, there is no testimony in this record that commercial importations of beef liver extract in paste form, processed from healthy livers and shipped under proper refrigeration, will decay or deteriorate in transit to this country, so as to render the product unusable, or really substantially less suitable, for ultimate manufacture. Specifically, there is no proof that if the merchandise here involved had been imported in paste form under refrigeration it would have deteriorated to such an extent as to impair appreciably its quality.

The defendant called as a witness the customs examiner of drugs who testified that, in the course of his duties, he had handled and advisorily classified about six regular commercial shipments of beef liver extract in paste form each year since 1949, the importations consisting of shipments in 10-kilo cans and 40-pound cans, as well as shipments in drums ranging from 200 to 400 pounds of material in shipments of up to 40 drums, and that from each shipment he had seen at least a 4-ounce sample. The witness further testified that importations of such merchandise during 1952 were in even greater numbers than in previous years, and that, as late as November 1952, there was a shipment of 40 drums of beef liver extract in paste form (R. 88–91). He further stated that on certain shipments he had seen the original packages or containers in which the beef liver extract in

paste form had been shipped, and that, in the course of his duties, he had personally seen samples of liver paste under refrigeration in the ship's refrigerating unit (R. 92).

The issue whether an imported commodity is a "crude" or an "advanced" drug has been before this and our appellate court on numerous occasions. In the *Judson Sheldon* case, *supra*, the imported merchandise consisted of beef liver extract in paste form, which, up to that stage, was processed in all material respects as was the powdered beef liver extract here under consideration. However, in the instant case, the process was continued through two additional steps—the paste was vacuum dried and then ground to powder. The purpose of the treatment of the livers in each case was to extract therefrom certain well-known vitamins of therapeutic value in the treatment of anemia, malnutrition, and other physical ailments. The pasty form of beef liver extract imported in the incorporated case was classified as an advanced drug under paragraph 34 of the tariff act but was claimed by the plaintiff as properly free of duty as a drug in a crude state.

In holding the imported commodity properly classifiable as a crude drug, not dutiable, the court in the *Judson Sheldon* case, *supra* (p. 77), stated:

> It is the position of the importer, as it was of the trial court, and their respective positions are abundantly supported by the uncontroverted testimony of record, that absolutely nothing was done in preparing the imported article except that which is necessary to extract the desired ingredient and recover it in its crudest, simplest state, that a crude drug emanated from a beef liver and that it was not advanced so as to deny it free entry under the terms of the pertinent tariff provision.

> * * * It seems clear to us that the extracting of the vitamin-containing, soluble portion of the liver, which is nothing "other than to get it by itself," *or, at most, bringing it to a condition where it could be safely packaged and transported,* does not remove the drug created by the extraction from its crude condition into one which Congress contemplated would be so advanced by processes applied abroad as to justify its being given a dutiable status. * * * [Italics ours.]

Counsel for the plaintiff in the present controversy concedes that the merchandise before us has been advanced in value and condition beyond that of the liver extract in paste form under consideration in the *Judson Sheldon* case, *supra*, but maintains that the additional processing of this merchandise, resulting in liver extract in dried powdered form, was necessary in order to prevent decay or deterioration in transit under nonrefrigerated conditions, as opposed to those in the *Judson Sheldon* case, *supra*, where the liver extract in paste form was imported under refrigeration; but that the vacuum drying and grinding processes were necessary to prepare the liver extract for shipment, without refrigeration.

The question of whether or not certain processes of preparation were "essential" to prevent decay or deterioration of a drug pending

manufacture, has been previously passed upon by this and our appellate court. *Geo. S. Bush & Co., Inc.,* and *Robert E. Landweer* v. *United States,* 15 Cust. Ct. 83, C. D. 949; *Vandegrift & Co.* v. *United States,* 13 Ct. Cust. Appls. 30, T. D. 40865; *Judson Sheldon Corp.* case, *supra.*

In the *Bush* case, *supra,* dogfish-liver oil, extracted from natural dogfish livers and containing medicinal properties inherent thereto, was held to be a crude drug under the provisions of paragraph 1669, *supra,* upon a record which established that the processing of the dogfish livers to acquire the imported oil was "essential" to the proper packing of the drug and the prevention of decay or deterioration pending manufacture. The court there stated that while the dogfish-liver oil in question was an advanced commodity, the proof established that there was no known way for exporting the valuable vitamin found in dogfish livers, without attendant decay or deterioration, except in the form of oil; that cooking the livers for preservation during the period of transportation would "destroy a large portion of the vitamin content"; and that macerating the livers to acquire the imported oil "saves vitamin content." The court, accordingly, held that the removal of the vitamin content from dogfish livers and dissolving it in oil did not advance the drug in value or condition beyond that contemplated by the provisions of paragraph 1669 for a crude drug.

In the *Vandegrift* case, *supra,* the merchandise consisted of glands and different organs of cattle, which the court found to be "natural, uncompounded, nonedible drugs of animal origin." The testimony disclosed that the fresh gland in a frozen condition could not be shipped because of lack of adequate refrigerating space; that the dried gland, when preserved with boric acid, lost its more active principles, and "that the only other practical method of transporting the crude drug containing the active principles desired, is by drying and grinding the glands and transporting the dried glands in powdered form," which was the condition in which the merchandise there under consideration had been imported. On the basis of such a record, the court held that drying and grinding were processes of preparation essential to the prevention of decay or deterioration pending manufacture. In so holding, the court stated:

> The proof shows that if the gland was dried, before the manufacturer could extract the principles, it must be ground. If the whole dried gland could be satisfactorily preserved without grinding it would seem that the grinding process would be an advancement bringing the commodity within paragraph 34, but as this record appears before us the proof shows that the gland is not imported in its dried condition except ground, and that *attempts to import the dried unground gland were unsuccessful.* It is clear that the drying is not an advancement, and in the record before us we think it appears that the grinding is a part of the process of preparation essential to the prevention of decay or deterioration pending manu-

facture. It may be a fact that the gland as a whole can be dried and satisfactorily transported to this country in its whole dried condition. If the record so showed we would be inclined to hold that the grinding would be an advancement taking it out of paragraph 1567, but in this record the contrary appears. [Italics ours.]

In the *Judson Sheldon* case, *supra*, the trial court held the beef liver extract in paste form classifiable as a crude drug, upon a record showing that it was wholly impracticable to ship the beef livers and that the imported liver paste was the only feasible form in which the desired therapeutic properties of Brazilian beef livers could be obtained. (13 Cust. Ct. 65, C. D. 871.)

The factual situations in the above-cited cases are different, however, from that which obtains in the case at bar. In the present case, the proof fails to establish that it was wholly impracticable, or even difficult, to ship liver paste containing the desired ingredient. The record shows otherwise.

The plaintiff, in the case at bar, maintains that though it be conceded that liver extract in paste form is the "crude" drug, yet there may be more than one form of a crude drug, and that the merchandise at bar, in its imported condition, remained a crude drug within the provisions of paragraph 1669, *supra*, after it was dried and ground. In support of such contention, our attention is directed to the case of *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245.

In the latter case, the merchandise consisted of certain gum resin obtained from oleoresin. The court therein held, in substance, that it was a crude drug and not advanced in value or condition; that it was the product of treating oleoresin or crude turpentine in order to secure the gum resin in its crude state; and that the process to which the oleoresin or crude turpentine was subjected was merely for the purpose of getting the resin by itself and to free it from certain impurities, such as chips, bark, insects, and dirt, accumulated in taking the turpentine from the tree.

The processing of the oleoresin to obtain the resin involved in the *Sheldon* case, *supra*, is not, however, comparable to the operations followed in obtaining the imported commodity, dried beef liver extract in powdered form. The heating of the oleoresin in the *Sheldon* case, *supra*, merely isolated the companion substances, turpentine and resin, and was nothing more than a mere screening or straining process, the only purpose of which was to get the desired gum resin by itself. That is not the situation in the case at bar, where the character of the drug itself has been changed in that the beef liver extract in paste form, which is the crudest form of the drug containing the desired ingredient, has been further advanced by drying and grinding. And "grinding," it should be observed, is one of the processes specifically mentioned in paragraph 34, *supra*, to be regarded as advancing in condition the drugs contemplated thereunder.

The latest expression of our appellate court on the question of whether or not certain processes were "essential" to prevent decay or deterioration of a drug, was had in *Eastman Kodak Company* v. *United States*, 26 Cust. Ct. 267, C. D. 1333, affirmed in *id.* v. *id.*, 41 C. C. P. A. (Customs) 114, C. A. D. 539, wherein the merchandise consisted of shark-liver oil imported from Mexico. The commodity was classified, as was the merchandise at bar, under paragraph 34, *supra*, as an advanced drug, with a duty assessment of 10 per centum ad valorem, and claimed, as here, properly free of duty under the provisions of paragraph 1669, *supra*, as a crude drug. In processing of the shark livers there involved, they were "ground to destruction * * * reducing them to a fine paste," which was cooked in water and lye. The mixture was then processed to separate the oil from the liver tissue and water. The oil was then shipped in 55-gallon drums from Mexico to the United States. The involved shark-liver oil was held properly dutiable, as classified, as an advanced drug.

Our appellate court in the *Eastman Kodak* case, *supra*, discussed and differentiated the case of *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 26 Cust. Ct. 251, C. D. 1332, involving the same classification and claim with respect to dogfish-liver oil, produced from the livers of dogfish, a species of shark. We note that C. D. 1332, *supra*, has been appealed (suit 4708), apparently on grounds not here discussed, and has not been decided to date.

The court in the *Bush* case (C. D. 1332), *supra*, at page 264, discussed the meaning of the word "essential," as applied to the processing of livers prior to exportation for the purpose of preventing decay or deterioration (paragraphs 34 and 1669). The opinion quoted the definition of the word "essential" from Webster's New International Dictionary, 1933, as follows:

**3.** Important to the highest degree; indispensable to the attainment of an object; indispensably necessary.

The court then made the following application of the definition:

Applying the cited definitions in association with the statutory language under discussion, processing of a crude drug to prevent "decay or deterioration pending manufacture" contemplates only such treatment or manipulation indispensably necessary for commercially satisfactory preservation of the drugs during transportation and pending manufacture, and which would prevent decay or deterioration that would result in substantial loss of the therapeutic or medicinal properties, rendering transportation and importation of the drugs into the United States commercially impracticable or infeasible. Applied to dogfish livers, the decay or deterioration would have to be so substantial in amount of loss of vitamin A that the livers, during the period of transportation, would become commercially unfit and unusable for the commercial extraction of vitamin-A bearing oil. The statute, permitting a process or treatment not beyond that essential to proper packing of the drugs and prevention of decay or deterioration, does not embrace or extend to *all* decay or deterioration or even ideal methods assuring maximum

effectiveness, but rather is limited to reasonable commercial means to prevent decay or deterioration.  [Italics quoted.]

\*  \*  \*  \*  \*  \*  \*

*The weakness in plaintiff's proof on this point is that none of the witnesses stated that when shark livers are preserved by any of the recognized commercial preservatives the loss of vitamin A from shark livers during transportation is so substantial that the preserved livers would be commercially unusable and the extraction of vitamin-A oil rendered commercially not feasible.  The gist of plaintiff's testimony is that none of the commercially accepted and recognized methods of preserving shark livers will completely halt deterioration and loss of vitamin A, and that none of such methods are completely effective.  But this is not what the statute requires for concluding that processing is "essential" to prevent decay or deterioration pending manufacture.  [Italics ours.]*

As enunciated in the *Bush* case (C. D. 1332), page 265, *supra*, "The statute, permitting a process or treatment not beyond that essential to proper packing of the drugs and prevention of decay or deterioration, does not embrace or extend to *all* decay or deterioration or even ideal methods assuring maximum effectiveness, but rather is limited to reasonable commercial means to prevent decay or deterioration."  [Italics quoted.]  Shipping under refrigerated conditions is a recognized manner of commercial preservative and a "reasonable commercial means to prevent decay or deterioration."  Plaintiff's evidence in this case is insufficient to establish that when beef liver extract in paste form is preserved by the recognized commercial preservative of refrigeration, the loss during transportation of the desired ingredient obtained from beef livers is so substantial that the preserved liver paste would be commercially unusable, or even materially damaged, and the extraction of the desired element commercially not feasible.  On the contrary, the record in the *Judson Sheldon* case, *supra*, incorporated herein, and the new evidence in this case establish that the paste form of the drug can be, and has been, safely shipped under refrigerated conditions.  It would, accordingly, appear that the further processes employed herein of drying and grinding the paste form of the beef liver extract were not essential to the prevention of decay or deterioration.  Subjecting the liver paste to said additional processes resulted in a drug, advanced in value or condition, within the contemplation of paragraph 34, *supra*, as classified.  Other considerations, whether economic or business, cannot affect the status of the imported merchandise as an advanced drug.  As stated by our appellate court in *United States* v. *R. Hillier's Son Co., Inc.*, 16 Ct. Cust. Appls. 103, 109, T. D. 42762:

The record now before us, as has been stated, discloses that the material in question here can be, and is, imported as bark, and that the form in which we now find it is not necessary for the prevention of decay or deterioration pending manufacture.  This being the test imposed by the statute, it can not be held to be crude.

The trial court in the *Judson Sheldon* case, *supra*, C. D. 871, page 67, commented:

* * * Further testimony revealed that procurement of satisfactory and adequate storage space presents a major difficulty in the shipment of Brazilian beef livers.

On the basis of the record presented, we hold that the imported merchandise, dried beef liver extract in powdered form, is an advanced drug, and dutiable, as such, under the provisions of paragraph 34, *supra*, of the Tariff Act, as modified, at the rate of 5 per centum ad valorem, as assessed.

The protest is overruled. Judgment will be rendered accordingly.